FILED
2022 Nov-01  PM 07:16
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION[1]

| | |
|---|---|
| HUNTSVILLE SENIOR SERVICES, LLC ) <br> d/b/a REGENCY RETIREMENT ) <br> VILLAGE OF HUNTSVILLE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE ALABAMA DEPARTMENT OF ) <br> PUBLIC HEALTH, SCOTT HARRIS, MD, ) <br> In his official capacity as ) <br> STATE HEALTH OFFICER ) <br> ) <br> ) <br> Defendants. ) | Case No. 3:22-cv-01347-LCB |

## <u>MEMORANDUM BRIEF IN SUPPORT OF INJUNCTIVE RELIEF</u>

Plaintiff HUNTSVILLE SENIOR SERVICES d/b/a REGENCY RETIREMENT VILLAGE of HUNTSVILLE ("Regency") is entitled to a temporary restraining order and preliminary injunction against the Alabama Department of Public Health and Scott Harris, MD, in his official capacity as State Health Officer, ("Defendants" or the "Department") to prevent irreparable harm threatened by the Department.  On or about October 14, 2022, the Department demanded that Regency evict nearly 60 senior citizens from Regency's Independent Living units simply because those tenants receive some type of assistance with their

---

[1] The reference to Northwestern Division in the Complaint is an error.

activities of daily living (ADLs).  By requiring that Regency evict individuals from their homes based on the individuals' need for assistance, the Department is requiring Regency to violate federal law, including but not limited to the federal Fair Housing Act.  The Department has also indicated that Regency's failure to comply with its mandate to evict these elderly individuals would result in the Department seeking enforcement against it.  Consequently, Regency is forced to either violate federal law or face potential action under state law.  The only relief available to Regency to prevent it from being forced to choose between the lesser of two evils is a temporary restraining order and preliminary injunction until this honorable Court can rule on the merits of the declaratory judgment action filed by Regency.

## **FACTS**

Regency set forth the underlying facts in this case in its Complaint seeking a declaratory judgment and injunctive relief.  For efficiency, Regency incorporates those Factual Allegations by reference and highlights the key facts associated with the urgency for the current relief sought.

1.     Regency operates a community of senior housing that offers several living options, including a skilled nursing facility ("SNF"), assisted living facility ("ALF"), memory care or specialty care assisted living facility ("SCALF") and independent living ("IL").

2.     Of those living options, all <u>but</u> the independent living are licensed and regulated by the Alabama Department of Public Health.

3.     The IL portions of Regency do not offer any health care observation or services.

4.     Some of Regency's IL tenants have contracted with third parties (NOT Regency) for personal care services, such as private duty nursing, or health care services, like hospice and home health.  Regency is not a party to the contracts and does not receive any benefit from the third party provider.

5.     The Department alleges that it received a complaint about the provision of hospice services within Regency IL and conducted an inspection of two hospice providers providing services at Regency IL.  As a result of these inspections, the Department issued a "Statement of Deficiencies" to the hospice providers and demanded that the hospice discontinue providing services at Regency IL.  The Statement of Deficiencies states that the hospice providers are in violation of Ala. Code § 22-21-33 because they are providing hospice services within an "unlicensed facility."

6.     At the same time the Department cited the hospice providers, it also issued a demand to Regency that it discharge all tenants living in the IL if they receive personal care or health observation or any level of assistance with their activities of daily living.  The Department demanded that Regency evict these

tenants no later than November 15, 2022.  Furthermore, the Department insisted that Regency screen all future tenants and prohibit anyone needing assistance with ADLs from living in the IL units.

7.     From October 14th through October 31st, Regency attempted to negotiate a resolution, or at the very least a standstill agreement, to prevent disrupting the lives of its tenants.  On October 31, 2022, the Department rejected the standstill agreement proffered by Regency and made no further attempts at resolution.

## ARGUMENT AND CITATION OF AUTHORITY

To obtain a preliminary injunction, the plaintiff must establish the following: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *See Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (internal citations omitted).  Regency can meet each of these elements as outlined below.

## 1.     THERE IS A SUBSTANTIAL LIKELIHOOD THAT PLAINTIFF WILL PREVAIL ON THE MERITS

Regency's complaint seeks a declaratory judgment on two issues.  The first is a determination from the Court that the Department's demands would require Regency to violate the federal Fair Housing Act, and the second that Regency is not operating

an unlicensed facility.  There is a substantial likelihood that Regency will prevail on the merits of both.

### A. *The Department's demand that Regency evict tenants from the Independent Living units would result in a violation of the federal Fair Housing Act and other federal and state laws.*

A housing provider who refuses to rent or otherwise makes unavailable or denies housing to any person because of the disability of that person violates the federal Fair Housing Act.  42 U.S.C. § 3604(f)(1).  Discriminating in the terms, conditions, or privileges of rental of housing, or in the provision of services or facilities in connection with that housing, because of a person's disability also violates the Fair Housing Act.  42 U.S.C. §3604(f)(2).  And a refusal to make a "reasonable accommodation in rules, policies, practices, or services, when such accommodations may be necessary" to afford a person with a disability equal opportunity to use and enjoy a dwelling constitutes discrimination on the basis of disability, resulting in the housing provider violating the Fair Housing Act.  42 U.S.C. § 3604(f)(3)(B).[2]

A housing provider who inquires into the disability status of a housing applicant plainly exceeds the scope of inquiry permitted by HUD's implementing

---

[2] All of these statutory violations of the federal Fair Housing Act would also be violative of the Alabama Fair Housing Law which has identical provisions.  Ala. Code §§ 24-8-4, 24-8-7.

regulations for the FHA.  That scope explicitly prohibits any inquiry "to determine whether an applicant for a dwelling … has a [disability] or to make inquiry as to the nature or severity of a [disability of such a person."   24 C.F.R. §100.202(c).  The "tenant selection" criteria the Department insists Regency adopt and enforce (refusal to admit any person to the IL units who needs any assistance with ADL or personal care at any level) would force Regency to routinely make these prohibited inquiries.  In order to decline rental in the IL units to anyone needing any assistance in ADL or personal care, Regency must by definition ask applicants about the existence, "nature or severity" of any disabling condition that might trigger that applicant's need to obtain assistive services.  Similarly, Regency's eviction of an IL resident because of that resident's need for any level of assistance with ADL or personal care would be unlawful discrimination, making housing unavailable or limiting the terms, conditions, or privileges of housing solely on the basis of a disability that requires the resident seek third-party assistance.

The Department's demands of Regency with regard to the IL units have long been considered discriminatory and unlawful under the Fair Housing Act. *LaFlamme v. New Horizons, Inc.,* 605 F. Supp.2d 378 (D. Conn. 2009); *Cason v. Rochester Housing Authority,* 748 F.Supp. 1002 (W.D. N.Y. 1990).  In *LaFlamme,* the defendant housing provider operated "independent living" housing which was not licensed and did not include the provision of any medical care, personal care, or

supervision of residents.  The lease for the rental housing specifically declared that a tenant "must be able to live *independently*," requiring the housing provider to conduct an assessment of the "medical and healthcare needs of each applicant" as part of the application process.  *LaFlamme,* 605 F. Supp.2d 382.  That "assessment" consisted of thorough review of medical records and also home visits that could include demonstrations of the applicant's ability to perform such "tasks" as transfer from a wheelchair.  After determining that a resident of the housing was no longer able to "live independently" following a hospital stay, the housing provider refused to allow the resident to return to her home in the "independent living" community. *LaFlamme,* 650 F.Supp. 2d 384-385.

Holding that "a person's disability, no less than his or her race or sex, is an impermissible reason to deny equal access to housing opportunities," the court in *LaFlamme* concluded the housing provider had discriminated against the returning resident on the basis of her disability by disallowing her continued tenancy because (the housing provider concluded) that the resident could not "live independently." *LaFlamme,* 605 F. Supp.2d 390.  In addition, the housing provider's practice of "evaluating the severity of applicants' physical and mental disabilities" constituted an unlawful "disability-based determination" related to housing, in violation of the Fair Housing Act.  Specifically, when the housing provider "demanded [the returning resident's] continued compliance with the [independent living]

requirement as a condition of tenancy – based on her disability," it unquestionably violated the returning resident's rights under the FHA.  *Id.  See also Niederhauser v. Independence Square Housing Corp.,* 4 FH-FL ¶ 16,305 at 16,305.6 (N.D. Cal. 1998) (mandating that residents of housing be completely self-sufficient and independent "are not requirements which a landlord may impose," and residents of housing potentially subject to that mandate are entitled to a declaration that the policy violates federal law and an injunction prohibiting enforcement of the policy) Attached as Exhibit A; *Cason,* 748 F. Supp. 1004 (a qualifying criterion that a housing applicant have "ability to live independently" unlawfully "authorizes and condones detailed inquiries into the nature and scope of the applicant's disabling condition").

In the instant matter, the Department demands that Regency evict any residents of the IL apartments who have disabilities requiring them to seek any assistance with ADL, personal care, or even medical care tasks.  In addition, the Department demands that Regency adopt an unlawful "assessment" of any housing applicants to determine whether they will need any such disability-related assistance when living in the IL apartments.  The Department insists, therefore, that Regency engage in conduct that explicitly and obviously constitutes unlawful discrimination on the prohibited basis of disability status.

If Regency were to accede to the Department's demands, it would engage in conduct that has routinely been held unlawful, exposing Regency to substantial civil liability under the Fair Housing Act.  In addition, numerous otherwise qualified individuals would be denied a housing opportunity solely because of their disability status.  The notion of "independent living" cannot be "used as an impediment to, rather than a benefit of, equal housing opportunities."  *LaFlamme,* 605 F. Supp.2d 390.  The Department's demands to Regency, whether "viewed at best as a paternalistic attempt to direct these individuals to more suitable housing and at worst, as prejudicial discrimination," will not be permitted under the Fair Housing Act. *Id.*

Based on the foregoing, Regency has a substantial likelihood of success on the merits of its claims that the Department's demands are unlawful and prohibited and must be enjoined.

### B. Regency is not operating an unlicensed facility under Ala. Code § 22-21-33.

Although Plaintiff need only establish likelihood of success on the merits under one claim, Regency's second claim, that it is not operating an unlicensed facility, is also likely to be successful.  *See Ron Group, LLC v. Azar*, 2021 WL 5576616 (M.D. Ala. 2021).

Under Alabama law, certain health care facilities are licensed and regulated by the Alabama Department of Public Health (the "Department").  See Ala. Code §

22-21-22.  This regulatory oversight allows the Department to inspect those facilities to determine compliance with licensure rules and regulations and take action against the facility if the facility is not in compliance.  See Ala. Code §§ 22-21-28 and 22-21-28.  Independent living facilities are not licensed or regulated by the Department.

Despite this lack of jurisdiction, the Department has demanded that Regency IL take the following actions to prevent the Department from taking "enforcement action" against Regency:

1. Regency discharges all hospice patients that are currently residing on the 5th and 6th floors by November 15, 2022.

2. Regency discharges all residents that reside on the 5th and 6th floors that are receiving health observation or personal care services by Senior Care of America[3] or any other provider of health care services by November 30, 2022.

3. Regency agrees to cease to accept new applications for the 5th and 6th floors for 30 days. The 30 days would terminate on November 15, 2022.

4. Future residents that are admitted to Regency's independent living facility are able to live independently without the assistance of an outside company

---

[3] Senior Care of America is one of the private duty nursing providers that has contracted with Regency's IL tenants.

to provide health supervision or personal care with activities of daily living.

Although the Department did not specifically state what enforcement action it could or would take if Regency did not acquiesce to its demands, it is Regency's understanding that the Department is seeking to categorize Regency IL as an unlicensed facility under Ala. Code § 22-21-33.  The Department has no basis to identify Regency IL as an unlicensed facility or pursue enforcement action on that basis.

Pursuant to Ala. Code § 22-21-33, it is unlawful (a Class B misdemeanor) for "any individual, association, corporation, partnership, limited liability company, or other business entity to operate or cause to be operated ***a hospital*** of any kind as defined in this article or any rules promulgated hereunder, without having been granted a license by the State Board of Health." Ala. Code § 22-21-33(a).  "Hospital" as defined by in the article includes:

> General and specialized hospitals, including ancillary services; independent clinical laboratories; rehabilitation centers; ambulatory surgical treatment facilities for patients not requiring hospitalization; end stage renal disease treatment and transplant centers, including free-standing hemodialysis units; abortion or reproductive health centers; hospices; health maintenance organizations; and other related health care institutions when such institution is primarily engaged in offering to the public generally, facilities and services for the diagnosis and/or treatment of injury, deformity, disease, surgical or obstetrical care. Also included within the term are long term care facilities such as, but not limited to, skilled nursing facilities, intermediate care facilities, assisted

> living facilities, and specialty care assisted living facilities rising to the
> level of intermediate care.

Ala. Code § 22-21-20 (emphasis added).  Not only are independent living facilities

not listed in this litany of entities that qualify as a hospital, but independent living

facilities, like Regency IL, are not primarily engaged in offering diagnosis and

treatment.  The mere fact that a third party provider of services enters the building

does not convert the IL into a hospital under this definition.  Therefore, Regency IL

was not required to obtain any type of license from the Department prior to

operation.

As with the definition of hospital, the definitions of other types of providers

further establishes that Regency IL is not an unlicensed facility.  The Department

has indicated that Regency would likely be classified as an unlicensed assisted living

facility and suggested that Regency could avoid enforcement action by becoming

licensed as such[4].  Under the Alabama Administrative Code, assisted living facilities

are defined as follows:

> "Assisted Living Facility" means an individual, individuals,
> corporation, partnership, limited partnership, limited liability company
> or any other entity **that provides, or offers to provide, any**
> **combination of residence, health supervision, and personal care to**
> **three or more individuals who are in need of assistance with**
> **activities of daily living which include bathing, dressing,**

---

[4] Regency has a license for 72 assisted living beds that are housed on the 3rd
and 4th floors of the building.

**ambulation, feeding, toileting, grooming, medication assistance, diet, and personal safety**.

Ala. Admin. Code § 420-5-4-.01 (emphasis added).  The key element to categorizing a residence as an assisted living facility is the provision of health supervision to three or more individuals.  Again, Regency IL does not provide health supervision or personal care to the tenants in the IL.

The relationship between the IL and the person residing therein is that of landlord and tenant.[5]  There is a lease agreement between the IL and the tenant that outlines the obligations of each.  Exhibit B.  Under Regency's lease, Regency provides "living accommodations in a designated apartment that affords personal privacy."  The rent includes "all meals, utilities, telephone, basic cable TV, weekly housekeeping and laundry service, activity and recreation programs."  *See* Ex. B.  There is no mention or offer of any type of personal care services or health supervision.  Therefore, Regency IL cannot be classified as an unlicensed assisted living facility.

Regency acknowledges that some of the tenants living in the IL units have contracted with third party providers for health services and personal care

---

[5] For example, Alabama courts have treated personal injury cases involving independent living facilities as a premises liability case and NOT a medical malpractice case involving a health care provider.  *See Shanklin v. New Pilgrim Towers, L.P.*, 58 So. 3d 1251 (Ala. 2010).

supervision.   These third party providers include private duty nursing service providers, hospice, home health, and outpatient rehabilitation therapy.  Those service providers are unrelated to Regency, and Regency receives no benefit from those providers.  There is no difference between these providers going to a private home or an apartment complex and coming to Regency IL to provide services.  The fact that there are more than three individuals receiving services from third parties does not change the analysis.  It is possible, if not likely, that multi-family dwellings across the state have more than three individuals living in them while receiving personal care services.  The Department is overreaching to claim that all such living arrangements fall under Ala. Code § 22-21-33 resulting in operation of an unlicensed facility.

Based on the foregoing, Regency is likely to succeed on the merits of establishing that it is entitled to a declaratory judgment that it is not operating an unlicensed facility.

## 2.    PLAINTIFF WILL SUFFER IMMEDIATE IRREPARABLE INJURY IF DEFENDANTS ARE NOT RESTRAINED AND ENJOINED, AND NO ADEQUATE REMEDY AT LAW EXISTS

Regency will suffer immediate irreparable injury if it is forced to comply with the Department's demands prior to a determination on the merits of its declaratory judgment action.  As discussed above, the Department is requiring Regency IL to evict anyone living in the independent living that receives any level of services with

ADLs and to screen any potential tenants for any disability prior to accepting them as tenants. This request will create immediate and irreparable harm by forcing the displacement of the majority of Regency's tenants without the possibility of those tenants returning. Additionally, Regency's reputation and goodwill in the community will suffer from labeling it an unlicensed facility.

"An injury is irreparable only if it cannot be undone through monetary remedies." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). One such injury that cannot be undone through a monetary remedy is an injury to a plaintiff's reputation or goodwill. In other words, under well-established Eleventh Circuit case law, "a showing of significant loss of customers and goodwill qualifies as an irreparable injury." *BellSouth Telecomms. v. MCImetro Access Transmission Servs.*, 425 F.3d 964, 970 (11th Cir. 2005) (holding that, where the plaintiff was losing a large number of customers per week and would continue to do so absent an injunction, a preliminary injunction was appropriate); *see also Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015) ("Although economic losses alone do not justify a preliminary injunction, the loss of customers and goodwill is an irreparable injury."); *Spiegel v. City of Houston*, 636 F.2d 997, 1001– 02 (5th Cir. Mar. 8, 1981) (affirming the district court's injunction after the district court concluded that the plaintiff satisfied the irreparable-injury requirement by showing that, without an injunction, a threat that its customers would be

"permanently discouraged from patronizing [the] business" existed); *Pareto Health (AL), LLC v. WeCare TLC, LLC*, No. 2:21-CV-00530-AMM, 2021 WL 4860760, at *4 (N.D. Ala. Apr. 23, 2021) (issuing a preliminary injunction where, among other things, the plaintiff showed the "irreparable loss of customer goodwill . . . and an imminent inability to provide continuous and uninterrupted patient care to the employees and family members of employees"); *Signature Util. Servs., LLC v. Jernigan*, No. 2:21-CV-00102-AMM, 2021 WL 1318678, at *12 (N.D. Ala. Feb. 8, 2021) ("Numerous precedents hold that the loss of customers, customer relationships, and goodwill is irreparable harm for purposes of injunctive relief, and this is the rule even if a later award of damages may compensate the plaintiff for part of those losses." (citations omitted)); *DJR Assocs., LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1231 (N.D. Ala. 2017).

In addition, irreparable harm exists where the potential economic loss to the plaintiff "is so great as to threaten the existence of the moving party's business." 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.); *see also Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. & Colleges*, 951 F. Supp. 2d 851, 854 (E.D. Va. 2012) (issuing an injunction where the plaintiff provided sworn testimony that, without the requested relief, the business "will quickly go out of business"); *Ahmed v. United States*, 47 F. Supp. 2d 389, 400–01 (W.D.N.Y. 1999) (holding that the plaintiff established irreparable harm by estimating that he would lose 50% of his

store's gross revenue as a result of the defendant's actions and that, without the requested injunction, his business would be forced out of business); *De La Nueces v. United States*, 778 F. Supp. 191, 194 (S.D.N.Y.1991) (holding that an allegation of loss of 50% of a store's business and the possibility that the store may close establishes irreparable injury).

Similar to the numerous cases cited above, Regency will suffer irreparable harm both through the loss of goodwill and reputation as well as economic loss that cannot be restored through a legal remedy. Regency currently enjoys a positive reputation in the community as a retirement village that offers the aging population a place to live and receive a continuum of care. Additionally, the licensed portions of Regency have an excellent history of regulatory compliance. If the Department forces Regency to evict or discharge the majority of the elderly people living in the IL, Regency's IL operations will face significant losses both reputationally and financially.

From a financial standpoint, Regency IL will lose roughly 70% of the tenants in Regency's IL. Such a drastic reduction in tenants would be devastating to Regency IL operations, and once those tenants are evicted, it is highly unlikely they will return. It would also be difficult to replace those tenants with new tenants in light of the Department's position that any new tenants would need to be screened prior to becoming a tenant to ensure that they will not need assistance with activities

of daily living or health supervision from an outside company. In light of the population that is served by Regency IL and independent living facilities generally, such a requirement would be impracticable, thwart the value independent living facilities serve in our communities, and significantly reduce Regency IL's business, if not destroy it altogether.

But, not only will Regency IL be harmed financially, its reputation and goodwill will also be harmed. Evicting 70% of its tenants would create negative discourse that would extend not only to the affected tenants and their responsible parties and family members but also the greater Huntsville community. Furthermore, the Department's position will also result in irreparable harm by incorrectly labeling Regency's IL as an unlicensed facility, which is a violation of Alabama law.  Not only would Regency's reputation be tarnished related to the eviction of tenants from the IL and the operation of the IL, but classifying the IL as unlicensed and in violation of law would certainly cause harm in all levels of its operation of the retirement community. Regency is a business with competitors, and a negative impact on its reputation and goodwill as extensive as this would cause damage that cannot be undone.

### 3.    PLAINTIFF'S THREATENED HARM OUTWEIGHS ANY HARM TO DEFENDANTS

Regency is seeking injunctive relief to maintain the status quo in the IL because, without it, Regency is forced to evict residents in violation of federal law.

The resulting harm not only impacts Regency as outlined above, but there will also be resulting harm to those individuals who are being forced to leave.  Many of these individuals do not have a residence other than their unit within the IL.  Finding a place that the Department deems appropriate, which apparently will require an evaluation of the level of ADL services they may need, will be taxing effort.  In fact, the Department recognized that finding alternate placement will require significant time and effort because it required the hospice providers to include in their response to the Statement of Deficiencies that any patient discharged from the hospice to a skilled nursing facility would be accomplished within 45 days.

On the other hand, the only harm to the Department would be a delay in the ability to pursue enforcement action against Regency IL.  Such action, if allowed, can take place after the hearing on the merits.  However, forcing ALL tenants receiving ANY level of personal services be discharged is beyond the Department's authority and is not supported by the Department's position that is seeks to move individuals in a more appropriate setting, even if the individual has no desire to move.  Therefore, there is no harm to the Department in allowing the IL tenants to remain in place until a formal determination can be made on whether Regency IL requires a license, and any alleged concerns related to the provision of care to these residents is undermined by the Department's continued oversight of the licensed providers providing services within Regency IL.

What's more, if the Department felt that Regency's operation of the IL was creating an immediate public harm, it could have sought injunctive relief on its own motion under Ala. Code § 22-21-33. For a month the Department has made demands of Regency; demands that would require Regency to violate federal law. While making these demands, the Department chose not to seek a determination on the merits of its position. It would be inappropriate for the Department to now suggest some immediate harm and ask this Court to disrupt the status quo.

**4.     INJUNCTIVE RELIEF WOULD NOT ADVERSELY AFFECT PUBLIC INTEREST AND PUBLIC POLICY**

Public Interest and public policy would not be disserved by the issuance of the injunctive relief requested by Regency. *See ShowCoat Sols., LLC v. Butler*, 2020 WL 1467215 (M.D. Ala. 2020). Regency simply requests that the status quo be maintained until a hearing on the merits. As with the weighing of the harms described above, the public has an interest in seeing that the individuals currently residing at Regency IL can remain there without the fear of eviction. Additionally, federal law affords the public the ability to choose the living environment of their choosing regardless of disability. The injunctive relief sought seeks to protect that public interest and the rights of individuals to not be discriminated against based on their disabilities. Finally, public policy demands that a party not be forced to violate federal law in order to comply with requirements imposed on it by a state agency.

Courts have "emphatically declared the public interest is served by effective enforcement of the" Fair Housing Act. *Diamond Housing of SE Idaho, LLC v. City of Ammon,* 381 F.Supp.3d 1262, 1279 (D. Idaho) *citing S. California Hous. Rights Ctr. V. Krug,* 564 F.Supp.12d 1138, 1145 (C.D. Cal. 2007); *Gonzales v. Recht Family P-ship,* 51 F. Supp.3d 989, 992-993 (S.D. Cal. 2014); and *U.S. v. Commonwealth of Puerto Rico,* 764 F. Supp. 220, 225 (D. Puerto Rico 1991).  In fact, the FHA specifically authorizes injunctive relief "as the court deems appropriate" to enforce the FHA, recognizing the significant public interest in abolishing discrimination.  42 U.S.C. § 3613(c)(1).  Therefore, injunctive relief allowing the IL tenants to remain and prohibiting the Department from taking enforcement action against Regency is in the best interest of the public and favored by public policy.

Respectfully submitted this 1st day of November, 2022.

*/s/ Marcus M. Maples*

Marcus M. Maples (ASB-5283-S81M)

**OF COUNSEL:**

BAKER DONELSON BEARMAN,
CALDWELL & BERKOWITZ, PC
420 20th Street North,
Shipt Tower, Suite 1400
Birmingham, Alabama 35203
Tel:   (205) 328-0480
Email:  mmaples@bakerdonelson.com

*/s/ Angela C. Smith*

Angela C. Smith (ASB-5584-N65C)

**OF COUNSEL:**

BURR FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Tel:   (205) 458-5209
Email:  acsmith@burr.com

*Counsel for Huntsville Senior Services, LLC
D/B/A Regency Retirement Village of
Huntsville*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2022, the foregoing has been served upon the following counsel of record via this Court's filing system as follows:

Dana H. Billingsley, Esq.
Sancha O. Howard, Esq.
Valerie Rucker Russell, Esq.
Alabama Department of Public Health
P.O. Box 30317
Montgomery, Alabama 36130
dana.billingsley@adph.state.al.us
sancha.howard@adph.state.al.us
valerie.russell@adph.state.al.us

*/s/ Marcus M. Maples*
OF COUNSEL