
FILED
2022 Dec-13  PM 01:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| HUNTSVILLE SENIOR SERVICES d/b/a REGENCY RETIREMENT VILLAGE OF HUNTSVILLE, § § § § § | |
| Plaintiff, § § | Case No.: 3:22-cv-1347-LCB |
| v. § § | |
| ALABAMA DEPARTMENT OF PUBLIC HEALTH and SCOTT HARRIS, § § § § | |
| Defendants. § | |

## OPINION & ORDER

Regency Retirement Village of Huntsville filed this action on October 20, 2022, naming as defendants the Alabama Department of Public Health and State Health Officer Scott Harris, M.D., in his official capacity. In its Original Complaint (Doc. 1), Regency sought declaratory relief (Count I) and a preliminary injunction (Count II). After a hearing on the injunction request, Defendants filed a Rule 12(b)(1) motion to dismiss (Doc. 17), contending that Regency's Original Complaint, even construed in the light most favorable to Regency, failed to state a claim upon which this Court could find grounds for exercising jurisdiction pursuant to 28 U.S.C. § 1331. Regency subsequently filed its Amended Complaint (Doc. 19)

and, for the first time, added a § 1983 claim (Count III) for violation of the Fourteenth Amendment's Due Process Clause.

Incorporating by reference the arguments set forth in their 12(b)(1) motion to dismiss (Doc. 17), Defendants filed an Amended Motion (Doc. 22) in response to the Amended Complaint. They maintain that Counts I and II are due to be dismissed for want of jurisdiction and additionally contend that Count III fails to state a claim upon which relief can be plausibly granted, likewise necessitating dismissal under the Rule 12(b)(6) standard.[1]

For the reasons set forth in greater detail below, the Court **DISMISSES** Counts I and II without prejudice and **DISMISSES** Count III with prejudice.

## I.    BACKGROUND

In light of this case's present posture, the Court accepts as true all well-pleaded facts in Regency's Amended Complaint (Doc. 19) and construes any genuine factual disputes in Regency's favor. The forthcoming overview thus derives its contents solely from Regency's recitation of the facts underlying this dispute.

Regency leases and operates a facility offering senior citizens "a continuum of care" ranging from "independent living" ("IL") to various forms of "assisted living." (Doc. 19 at 1–2.) Assisted living facilities ("ALFs") and ILs are different in

---

[1] The Court has given due consideration to Plaintiff's Response (Doc. 23).

an important way: Under Alabama law, an ALF is a "hospital"; an IL is not.[2] And that distinction is, naturally, more than merely nominal. Of the two types, only ALFs require licensure.[3]

Regency's ALF and IL units are also distinct in that Regency neither provides nor otherwise offers any hospice care or assistance with daily living activities ("ADL") to its IL tenants, who instead contract with third-party providers to which Regency has no legal connection. (Doc. 19 at 2, 8–9.) In fact, this entire dispute revolves around the separation (or lack thereof) between Regency and the provision of those services. To summarize, Regency claims that its IL facility is "functionally and legally the same as any other privately-owned multifamily residential apartment community,"[4] while the Department contends that Regency IL is but a thinly veiled ALF for which Regency is without the requisite licensure and at which the provision of licensed hospice services is accordingly unlawful under § 22-21-33 of the Alabama Code.

Section 22-21-33 both prohibits the provision of licensed care at any unlicensed "hospital" and provides for the Department's enforcement in Alabama circuit court. The statute reads, in relevant part, as follows:

---

[2] *See* ALA. CODE § 22-21-20. To be clear, though the statutory definition of "hospital" expressly includes ALFs but not ILs, the list of facilities is non-exhaustive and does not expressly exclude ILs from its scope. *Id.* But even assuming (without deciding) that Regency IL is not a hospital, dismissal of this suit remains the Court's only option for the reasons discussed *infra* Section III.
[3] ALA. CODE § 22-21-33; *see also* note 2, *supra*.
[4] (Doc. 19 at 7.)

Any . . . entity who operates or causes to be operated a hospital of any kind as defined in [§ 22-21-20] . . . without having been granted a license by the State Board of Health shall be guilty of a Class B misdemeanor upon conviction . . . . The State Board of Health, upon determination that a facility or business is operating as a hospital, within the meaning of this article or any rules promulgated hereunder, and that the facility or business does not have a current and valid license granted by the State Board of Health, may apply to the circuit court of the county in which the unlicensed facility or business is located for declaratory and injunctive relief. The proceedings shall be expedited. The sole evidentiary questions before the court in a proceeding shall be whether the facility or business that is the subject of the action meets the definition of a hospital, within the meaning of this article and any rules promulgated hereunder, and whether the facility or business has been granted a current and valid license to operate by the State Board of Health. If the State Board of Health prevails on these questions, then the court, upon request of the State Board of Health, shall grant declaratory and injunctive relief requiring the operator or operators to close the facility or business and requiring the operator or operators to move all residents or patients to appropriate placements. Any individual failing to obey an injunction to close a hospital shall be guilty of a Class A misdemeanor. . . . A licensed hospice or certified home health agency acting through an authorized agent of the licensed hospice or certified home health agency shall not knowingly provide treatment or services in an unlicensed hospital to a person who is in need of care rendered by a licensed hospital.

ALA. CODE § 22-21-33(a)(1)–(2), (b)(1). In sum, enforcement proceedings under § 22-21-33 are expedited, and they present for the circuit court's resolution one evidentiary question: whether the facility at issue is a "hospital" (and, if so, whether the hospital possesses the requisite state licensure). *Id.* The Department's enforcement of that statute is what Regency seeks to proactively enjoin by way of this federal court's entry of declaratory and injunctive relief—at bottom, the reason

Regency has appeared before this Court is to prevent state-court enforcement proceedings under § 22-21-33.

In factual terms, the parties' dispute was born when the Department issued a "Statement of Deficiencies and Plan of Correction" to a pair of its licensed hospices ("the Hospice Providers"), in which "the Department declared that the licensed Hospice Providers' contracts for services with [Regency IL] residents constitute unlawful delivery of licensed services in an 'unlicensed facility'" in violation of Alabama Code § 22-21-33. (Doc. 19 at 9.) As mentioned previously, Regency takes issue with that declaration, alleging that because it provides no healthcare services to its IL residents, the IL facility is not a "hospital" under Alabama Code § 22-21-20 and thus is not subject to enforcement of § 22-21-33's licensure requirement.

The Department has initiated licensure actions against the Hospice Providers (Doc. 19 at 12) as a result of its determination that Regency is operating in violation of § 22-21-33, and the Hospice Providers have "notified [IL] residents of the providers' intent to cease delivery of hospice services to those residents because of the actions of the Department," (Doc. 19 at 18–19). Regency also alleges that "the Department's deci[sion] to label Regency an 'unlicensed facility' . . . has caused providers to refuse to work with [Regency's] residents." (Doc. 19 at 21.)

The Department has also demanded, as a result of its § 22-21-33 determination, that Regency evict all IL tenants receiving hospice care or any level

of ADL and, in addition, that Regency screen future applicants regarding their need for ADL, rejecting those who do (and transferring to higher-care facilities those for whom the need later arises). The Department has indicated to Regency that noncompliance with those demands will result in the Department's pursuit of judicial enforcement under § 22-21-33.[5]

Regency claims to have been denied due process of law with respect to the Department's determination. More specifically, Regency alleges that Scott Harris (acting for the Department) has offended the Due Process Clause by "determin[ing] that Regency is an unlicensed facility under Alabama Code § 22-21-33"—and thereby "depriv[ing] Regency of its . . . liberty and property interests, including its interests in its contractual [IL] lease agreements"—without first "provid[ing] fair notice or an opportunity to be heard." (Doc. 19 at 4, 20–21.) Separately, Regency raises a federal-law defense to the Department's prospective enforcement action, alleging that compliance with the Department's demands would require Regency to

---

[5] (Doc. 19 at 3.) "The Department threatened litigation against Regency if its demands were not met, dictating that Regency needed to evict [the] residents as early as November 15, 2022." (*Id.*)

commit disability[6] discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*[7]

## II.   LEGAL STANDARD

### A.   <u>Rule 12</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits parties to request dismissal of claims that fail to satisfy Rule 8(a)'s pleading requirements. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 566 U.S. 662 (2009). Rule8(a) requires "enough facts to state a claim to relief that is plausible on its face" or, in other words, that bring "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). If, construing all well-pleaded facts in the light most favorable to the nonmovant, the pleading lacks "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," dismissal is in order. *Id.*

---

[6] Regency characterizes IL residents' need for ADL or hospice care as a disability for purposes of the civil rights statutes, which Defendants have not disputed. (Doc. 19 at 8); *see also Advocacy Ctr. v. Woodlands Estates Ass'n*, 192 F. Supp. 2d 1344, 1347 (M.D. Fla. 2002) (finding FHA disability, in part due to receipt of ADL).

[7] (Doc. 10 at 9.) "If Regency were to accede to the Department's demands, it would engage in conduct that has routinely been held unlawful, exposing Regency to substantial civil liability under the Fair Housing Act." (*Id.*)

Similarly, Rule 12(b)(1) allows parties to bring jurisdictional issues to the Court's attention. Rule 12(b)(1) motions come in either of two forms: facial or factual. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). Facial challenges "require the court to merely look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Id.* (citations omitted). And unlike in instances of factual attack, a plaintiff opposing a facial challenge to jurisdiction "is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true." *Id.* (citations omitted).

### B.   <u>Subject Matter Jurisdiction</u>

"Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause."); *see also Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671 (1950) ("'[J]urisdiction' means the kinds of issues which give right of entrance to federal courts."). Before resolving substantive disputes in any case, courts are dutybound to ensure the existence of a proper jurisdictional basis for doing so. *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 831 (1999) (citation omitted). "[J]udicial duty is not less fitly performed by declining ungranted jurisdiction than

in exercising firmly that which the Constitution and the laws confer." *McCardle*, 74 U.S. at 514.

"Absent diversity of citizenship, federal-question jurisdiction is required," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987), by way of which the district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States.'" 28 U.S.C. § 1331. Application of the "well-pleaded complaint rule" determines whether a claim "arises under" federal law, so a facially implausible claim cannot confer jurisdiction upon the district court. *See Franchise Tax Bd.*, 463 U.S. at 2; *see also* Section II(A), *supra* (describing the standard).

Relatedly, "[t]he operation of the Declaratory Judgment Act[8] is procedural only." *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 15 (1983) (quoting *Skelly Oil*, 339 U.S. at 671). Through the Act, "Congress enlarged the range of remedies available in the federal courts, . . . [b]ut the requirements of jurisdiction—the limited subject matters which alone Congress had authorized the District Courts to adjudicate—were not impliedly repealed or modified." *Skelly Oil*, 339 U.S. at 671. On that score, "[i]n cases in which the plaintiff seeks a declaratory judgment that he would have a valid defense to an anticipated claim, we consider whether a federal question would arise in a hypothetical non-declaratory suit in

---

[8] 28 U.S.C. § 2201.

9

which the declaratory-judgment defendant is the plaintiff and the declaratory-judgment plaintiff is the defendant." *Chase Bank USA v. City of Cleveland*, 695 F.3d 548, 554 (6th Cir. 2012) (citing *Franchise Tax. Bd.*, 463 U.S. at 19).

If in that hypothetical litigation the federal question would arise "only as a defense to [the] state created action," the question is unavailable to a federal-court plaintiff seeking jurisdictional support for its case. *Franchise Tax Bd.*, 463 U.S. at 16 (citations omitted). In such cases, "[t]he most that one can say is that a question of federal law is lurking in the background." *Gully v. First Nat'l Bank*, 299 U.S. 109, 117 (1936) (Cardozo, J.) ("A dispute so doubtful and conjectural, [s]o far removed from plain necessity, is unavailing to extinguish the jurisdiction of the states."); *see also Patel v. Hamilton Med. Ctr., Inc.*, 967 F.3d 1190, 1194 (11th Cir. 2020) (Although [plaintiff's] request for declaratory judgment turns on an issue of federal law, 'we do not look to the face of the declaratory judgment complaint in order to determine the presence of a federal question.'") (quoting *Hudson Ins. Co. v. Am. Elec. Corp.*, 957 F.2d 826, 828 (11th Cir. 1992)). In sum, "a federal district court has subject-matter jurisdiction over a declaratory judgment action if . . . a plaintiff's well-pleaded complaint alleges facts demonstrating the *defendant* could file a coercive action *arising under federal law*." *Household Bank v. JFS Grp.*, 320 F.3d 1249, 1259 (11th Cir. 2003) (emphasis added) ("No federal appellate court has reached a contrary conclusion.").

### III.   DISCUSSION

Regency's constitutional claim (Count III) is not plausible on its face, *see infra* Section III(A), and its remaining allegations do not give rise to a controlling federal question capable of supporting the Court's exercise of jurisdiction over this case, *see infra* Section III(B).

### A.   <u>Due Process</u>

States are forbidden, by the Due Process Clause,[9] from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir.1994)). No process is due absent state-effectuated deprivation of an interest for which the constitution affords protection. *Id.* So the question of constitutional adequacy arises only upon a sufficient showing that the state has deprived the plaintiff of protected interest. *Id.*; *see also Ill. Psych. Ass'n v. Falk*, 818 F.2d 1337, 1343 (7th Cir. 1987) (Posner, J.) ("The clause does

---

[9] The Supreme Court makes no distinction between procedural due process claims arising under the Fifth and Fourteenth Amendments. *See Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). This Opinion accordingly discusses precedents and underlying principles interchangeably, notwithstanding their focus on the Fifth of Fourteenth amendment in a particular instance.

not make the denial of due process actionable; it only makes the deprivation of life, liberty, or property, without due process of law, actionable.").

Regency has not plausibly established deprivation of protected liberty or property.

### i.   *Deprivation*

As an initial matter, not "everything that might be described as a 'benefit'" falls within the scope of the Due Process Clause. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citation omitted). On that front, Regency claims a constitutionally protected interest in the IL lease agreements. (Doc. 19 at 21.) But the issue of whether those interests fall within the purview of the Due Process Clause is ultimately of no moment here because Regency's allegations do not plausibly support the notion that, in the due process sense, any of its substantive interests have been adversely affected *as a direct result* of state action. In other words, even assuming, *arguendo*, that Regency has a constitutionally protected interest in the IL lease agreements, Regency is unable to plausibly allege that the Department, vis-à-vis the effects of its statutory construction on third-party hospice providers, has directly infringed (i.e., "deprived") any liberty or property interest of Regency's.

To support a procedural due process claim, the claimant's protected interest must have been *directly* affected by governmental action; "[a]n indirect and incidental result of the Government's enforcement action," even with respect to a

protected interest, "does not amount to a deprivation of any interest in life, liberty, or property" in the constitutional sense. *Id.* at 767 (quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980)). The procedural safeguards of the Due Process Clause simply do "not apply to the indirect adverse effects of governmental action." *O'Bannon*, 447 U.S. at 789 (citation omitted); *accord Water Works and Sewer Bd. v. U.S. Dep't of Army, Corps of Eng'rs*, 983 F. Supp. 1052, 1063 (N.D. Ala. 1997). If the infringement of a protected interest was merely the indirect result of some governmental action, the Due Process Clause does not entitle the injured party to notice or an opportunity to be heard on the issue. *O'Bannon*, 477 U.S. at 786–87.

On the deprivation front, Regency claims that by "labeling" Regency IL a "hospital" as defined in Title 22 of the Alabama Code—a determination that, if statutorily sound, would require the facility to obtain licensure or otherwise remain subject to enforcement proceedings under § 22-21-33—the Department deprived Regency of an interest in its lease agreements with IL residents. (Doc. 19 at 21.) More specifically, Regency has constitutional qualms with the Department's determination because it has steered third-party healthcare providers from working with Regency's residents even though Regency admittedly has "no legal connection" to any of those third-party providers or to their contracts with the IL residents (as either a party thereto or a beneficiary thereof). (Doc. 19 at 9, 21.)

13

The *O'Bannon* decision, however, applies cleanly here and illuminates the flaw that ultimately proves fatal to Regency's §1983 claim. In that case, the Supreme Court was tasked with deciding whether the state's public health department "deprived" nursing-home residents of a protected interest by revoking the home's Medicaid certification, thereby forcing approximately 180 senior citizens to seek residence elsewhere. 447 U.S. at 775. The residents filed suit in federal district court alleging entitlement "to an evidentiary hearing on the merits of the decertification decision" before discontinuation of the home's certification. *Id.* at 777. They claimed that discontinuation "would require Town Court to close," which in turn "would cause [them] to suffer both a loss of benefits and immediate and irreparable psychological and physical harm" *Id.* But the Court disagreed, holding that the residents suffered no deprivation in the due process sense because their injuries were merely the "indirect and incidental result" of the department's decision to decertify the home. *Id.* at 786–87.

Distinguishing the effect of the department's decision on residents from a case in which, for example, a state denies a welfare recipient's eligibility for assistance without notice or hearing, the Supreme Court reasoned as follows:

> Although decertification will inevitably necessitate the transfer of all those patients who remain dependent on Medicaid benefits, it is not the same for purposes of due process analysis as a decision to transfer a particular patient or to deny him financial benefits, based on his individual needs or financial situation. . . . This case does not involve the withdrawal of direct benefits. Rather, it involves the [Department's] attempt to confer an indirect benefit on

14

Medicaid patients by enforcing minimum standards of care on facilities like Town Court. When enforcement of those standards requires decertification of a facility, **there may be an immediate, adverse impact on some residents. But surely that impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property**.

*Id.* at 786–87 (emphasis added).

Simply put, the fact that a state's licensure-related determination regarding a nursing facility "may lead to severe hardship for some of its elderly residents does not turn the [state action] into a governmental decision to impose that harm" on residents. *Id.* at 789. Instead, "the simple distinction between government action that directly affects a citizen's legal rights, or imposes a restraint on his liberty, and an action that is directed against a third party and affects the citizen only indirectly or incidentally," the Court decreed, controls the determination in such cases. *Id.* at 768; *see also Kerry v. Din*, 576 U.S. 86, 101 (2015) (noting that the loss of "something important" does not necessarily trigger the Due Process Clause and warning that "we are in for quite a ride" if courts fail to make the distinction between direct and indirect effects of state action).

In sum, the brunt of the *O'Bannon* Court's reasoning was this: The state did not force tenants to leave but merely enforced its laws against the facility, and notwithstanding the effects of its decision, any adversely impacted tenants suffered no state-imposed "deprivation" in the due process sense because the harm resulted from action directed elsewhere. *Id.* at 787 (refusing to hold differently on account of

15

residents' "difficulty locating other homes they consider suitable" or any "emotional and physical harm [resulting from] disruption associated with their move"). And the principle makes good sense because, as a practical matter, the residents lost only their ability to receive Medicaid at Town Court Nursing Center; the state did not strip away their ability to obtain the necessary care from a qualified facility. *Id.* (noting that no residents "would lose the ability to finance his or her continued care in a properly licensed or certified institution"). The residents were simply once removed from the state's action.[10]

Regency has unwaveringly maintained that it bears no connection whatsoever to the third-party healthcare providers or their contracts with IL residents, which Regency maintains distinguish its IL facility from a "hospital." In fact, the merits of the parties' dispute here hinge largely—if not entirely—on that determination. Even still, Regency claims to itself have suffered deprivation of constitutionally protected property by way of the Government's licensure actions against hospice providers with which Regency's tenants independently contract. No reasonable construction of the Amended Complaint indicates the presence of government action aimed

---

[10] Though no residents had "any claim against the responsible governmental authorities," the *O'Bannon* Court did take care to mention that residents in such a position "might have a claim against the nursing home for damages" on, say, a contract suit for breach of a leasing agreement. *See id.* at 787–88; *see also id.* at 789 (noting that since the 19th Century, the Due Process Clause has not covered "indirect adverse effects of governmental action" or otherwise safeguarded "consequential injuries resulting from the exercise of lawful power") (quoting *Legal Tender Cases*, 79 U.S. 457 (1870), *abrogated on other grounds by Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021)).

directly toward Regency. Regency claims a right to constitutional relief because the Hospice Providers have ceased services at the state's behest—and others have followed suit, notwithstanding the merits of the Department's determination—which will lead Regency IL tenants to leave and thereby affect Regency's interest in the IL lease agreements. Regency's alleged injuries are the mere consequence of state action directed toward the Hospice Providers, and any adverse impact borne by Regency's lease agreements is purely incidental to the Department's Statement of Deficiencies and Plan of Correction; this simply does not amount to a "deprivation" in the constitutional sense.

Nothing before the Court supports the notion that the alleged harm is more than merely incidental to the Department's action. But even if Regency could be said to have implicitly argued as much by stating that the Department "inten[ded] to force [IL] tenants to leave,"[11] the Court doubts whether such facts support a finding of "direct" deprivation *even with respect to the residents*, much less Regency. In *O'Bannon*, licensure revocation was unquestionably bound to result in relocation-related hardship for any plaintiff residents who were reliant on the discontinued services, but the Supreme Court refused to construe that result as anything more than "incidental" or "indirect" in the due process sense. All of that to say this: the Court doubts whether even Regency IL residents could be said to have suffered

---

[11] (Doc. 21 at 3.)

"deprivation" of a protected interest. But in any event, that question is not before this Court because Regency Retirement Village is the lone constitutional claimant here and asks this Court to determine that the Department's licensure action against the Hospice Providers, which Regency fears will ultimately result in hardship for its IL tenants, will *directly*—in the due process sense—result in the infringement of Regency's constitutionally protected property. That, the Court cannot do. By its own allegations, Regency is twice removed from the Department's interaction with the Hospice Providers. Construing the law in line with Regency's position would not only flout straightforward Supreme Court precedent but, as a practical matter, would recognize a sweeping array of rights that the Constitution does not, thereby subjecting states to unfounded liability in suits brought by parties against which the state directed no action.

On a related note: The Court need not find—and does not purport to find— that the Department's interpretation and construction of § 22-21-20 is correct in order to hold that Regency's due process claim fails as a matter of law. Nor does Regency's inability to actively seek relief in state court preclude such a finding.

For example, in *Falk*, Illinois's public-health department ("IDPH") publicly declared, "allegedly without complying fully with the rulemaking procedures required by the state's administrative procedures act[,] that it interpreted [a] regulation" governing educational requirements for admission to hospital staffs as

permitting psychiatrists but excluding psychologists. *Ill. Psych. Ass'n v. Falk*, 818 F.2d 1337, 1339 (7th Cir. 1987) (Posner, J.). The psychologist "plaintiffs' strongest claim [was] to a denial of due process," which the court ultimately rejected. *Id.* at 1342. The psychologists argued that "no administrative or judicial procedures [were] open to them under Illinois law for challenging the interpretation," which the plaintiffs said would lead hospitals to bar them from admission even though, in the plaintiffs' view, IDPH had wildly misinterpreted the regulation. *Id.* Stated differently, the plaintiffs sought constitutional protection because even though the state's declared interpretation was wrong, no reasonable hospital would risk contravening that interpretation and admitting psychologists. *See id.* Because hospitals would, in all likelihood, be unwilling to risk defiance of IDPH's decree (however flawed), the psychologists were without remedy where Illinois law offered them no avenue—i.e., no cause of action—through which to seek unbiased regulatory interpretation. *See id.* Writing for the panel, Judge Posner noted that while "sympathetic to the plaintiffs' plight," the court had "the gravest doubt whether, even if everything [plaintiffs said] about the character and consequence of [IDPH's] interpretation [was] correct, [plaintiffs] have shown a denial of due process." *Id.* at 1342–43.

In so holding, the court of appeals made clear that "[t]he Due Process clause does not require fair notice and an opportunity for a hearing (the essential

constituents of adjudicative process) when a public official charged with enforcing a statute . . . merely announces his interpretation of the statute." *Id.* at 1343. To be sure, "[s]uch announcements can do substantial harm and may be difficult to obtain judicial review of, *but they are not the type of governmental action that has been thought to trigger a right to demand procedural safeguards*." *Id.* (emphasis added). So even if the Department has wildly misinterpreted Title 22 of the Alabama Code—a dispute on which the Court provides no comment—dismissal of Regency's § 1983 claim on the pleadings would be nonetheless proper. The state has not directly disenfranchised Regency.

###     ii.     *Requisite Procedure*

If in fact the claimant has suffered infringement of a protected interest at the state's hand, only then does the Due Process Clause "entitle[] an individual to notice and some form of a hearing before state action may finally deprive him or her of a property interest." *Cryder*, 24 F.3d at 177 (citing *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976)). In assessing the Clause's procedural requirements with respect to a well-pleaded deprivation, due process presents "a flexible concept that varies with the particular circumstances of each case." *Grayden*, 345 F.3d at 1232–33 (first citing *Gilbert v. Homar*, 520 U.S. 924, 931–32 (1997); then citing *Zinermon v. Burch*, 494 U.S. 113, 127 (1990); and then citing *United States v. Wattleton*, 296 F.3d 1184, 1198 (11th Cir. 2002)).

20

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful place.'" *Id.* (quoting *Matthews*, 424 U.S. at 333); *see also Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). And "unless the state refuses to make available a means to remedy the deprivation," the claimant has not been denied a meaningful opportunity to be heard. *Barr v. Jefferson Cnty Barber Comm'n*, 250 F. Supp. 3d 1245, 1255 (N.D. Ala. 2017) (first quoting *McKinney v. Pate*, 20 F.3d 1550, 1563 (11th Cir. 1994) (en banc) (seminal Eleventh Circuit case on the issue); then citing *Foxy Lady, Inc. v. City of Atlanta*, 347 F.3d 1232, 1236 (11th Cir. 2003); and then citing *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000)). "[P]rocedural due process violations do not even exist unless no adequate state remedies are available." *Cotton*, 216 F.3d at 1331; *see also id.* at 1331 n.2 (citations omitted).

To be clear, the principle "does not look to the actual involvement of state courts or whether they were asked to provide a remedy in the specific case now before the federal court." *Horton v. Bd. of Cnty. Comm'rs*, 202 F.3d at 1297. Federal courts' refusal to entertain procedural due process claims "unless inadequate state procedures exist to remedy an alleged procedural deprivation" makes good sense; "the state must have the opportunity to remedy the procedural failings of its agencies, in the appropriate fora," such as "state courts," before being made subject to a claim for constitutional malfeasance. *Cotton*, 216 F.3d at 1331.

Here, the Department has in no way failed to present Regency a meaningful opportunity to be heard regarding its determination that Regency is an unlicensed "hospital"; just the opposite is true. An enforcement action by the Department would necessarily resolve the parties' core dispute—on an expedited schedule, no less— and though the Department unequivocally stated its intent to effectuate just that by November 15, Regency has asked this court to enjoin the state-court determination that Regency simultaneously characterizes as unavailable.[12] Despite unwaveringly contending that its IL facility is not a hospital, Regency aims here to prevent the Alabama circuit court from determining that contention's validity. Stated differently, Regency—from either side of its mouth—asks this Court to enjoin the Department from filing an enforcement action in Alabama circuit court and bases a constitutional claim on the alleged unavailability[13] of state-court recourse.

To be clear, the enforcement proceeding that Regency seeks to enjoin would indisputably resolve this action. If the Alabama circuit court finds that Regency is not a hospital, the Department would then have no grounds for finding the Hospice Providers to be in violation of Alabama law or to otherwise demand that Regency evict IL residents for receipt of third-party ADL. Despite Regency's contention that the Department alone, and not Regency, is authorized to bring such an enforcement

---

[12] (Doc. 19 at 4.) "Additionally, Regency seeks injunctive relief preventing the Department from taking enforcement action against Regency to effectuate its demands of Regency . . . ." (*Id.*)

[13] (Doc. 19 at 10.)

action, the Court cannot say that "no adequate state remedies exist" under the circumstances of this case. The Court will not allow Regency, with a facially implausible constitutional claim, to effectively deprive the State of its exclusive jurisdiction over this dispute. To claim deprivation of process after halting execution of that process is a *non sequitur*.

### iii.   *Conclusion*

Even assuming that the Constitution provides some protection for the liberty and property interests that Regency claims have been adversely affected here, the State has not directly infringed any of those interests and thus cannot be said to have "deprived" Regency thereof in the due process sense. Regency's § 1983 claim is therefore implausible on its face and due to be dismissed. Additionally, and even if Regency's protected interests have been infringed, Regency's claim still fails because under the circumstances of this case, the Court cannot find that remedy is unavailable at the state level; in other words, the State has not prevented Regency from being heard on the issue.

For those two, independent reasons, Count III of the Amended Complaint (Doc. 19) is implausible on its face and must be dismissed with prejudice.

### B.   **Fair Housing Act**

Having disposed of Regency's § 1983 claim, within the Amended Complaint (Doc. 19) remains but one allegation implicating federal law. To that end, Regency

claims that even if Regency IL constitutes a "hospital" subject to state regulation (including the licensure requirement), federal and state fair housing law would provide an additional line of defense on its behalf. More specifically, Regency claims that if it "were to accede to the Department's demands, it would be forced to evict [IL] residents" on the basis of disability, which Regency alleges would amount to unlawful discrimination under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (Doc. 19 at 16.) That allegation cannot support this Court's exercise of § 1331 jurisdiction.

Regency's FHA allegations present the precise scenario in which a declaratory-judgment claimant asserts, as a basis for jurisdiction, a federal defense in anticipation of the declaratory-judgment defendant's action under state law. No federal cause of action would be available to the Alabama Department of Public Health in such a dispute. This Court cannot rob the State of its jurisdiction on the basis of such a far-out federal question. And at bottom, this case does not necessarily turn on a determination of federal law; a state-law determination that Regency is not a "hospital" would obviate the need for Regency to rely on federal law in opposition to the Department's demands.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Amended Motion (Doc. 22) and **DISMISSES** this suit in its entirety—Counts I and II without prejudice and Count III with prejudice. Regency's request for injunctive relief and Defendants' initial motion to dismiss (Doc. 17) are denied as **MOOT**.

**DONE** and **ORDERED** December 13, 2022.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE